# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| CHARLEY KARPINSKI, *individually and on behalf of all others similarly situated*, | ) ) ) ) Case No.: |
|  | ) |
| Plaintiff, | ) **DEMAND FOR JURY TRIAL** |
|  | ) |
| v. | ) |
|  | ) |
| 700 CREDIT, LLC, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## CLASS ACTION COMPLAINT

Plaintiff Charley Karpinski, by his undersigned counsel, files this Class Action Complaint on behalf of himself and a class of all similarly situated persons against Defendant 700Credit, LLC. Plaintiff bases the forgoing allegations upon personal information and belief, the investigation of counsel, and states the following:

## INTRODUCTION

1.      Defendant 700Credit providers credit reports, credit data, identity verification, fraud detection, and compliance services to over 21,000 automotive, RV, powersports, and marine dealerships across the United States.[1] Dealers access

---

[1] 700Credit, https://www.700credit.com/ (last visited Dec. 15, 2025).

the 700Credit's services by logging in through the 700Dealer.com application portal.[2]

2.    On October 25, 2025, 700Credit discovered that "certain records" in the 700Dealer.com application "were copied without authorization."[3] These records included Sensitive Information such as names, addresses, and social security numbers collected from 5.8 million consumers by dealers between May 2025 and October 2025.[4]

3.    700Credit appears to have violated a number of web-based application best practices, permitting cybercriminals to gain access to Plaintiff's and the Class's highly sensitive information.

4.    Had 700Credit employed basic, long-established, and recommended security tools, the Data Breach should have been easily thwarted. However, 700Credit failed to, at a minimum, failed to: (1) enact proper API access and authorization protocols, (2) utilize rate limiting and throttling, (3) deploy of API

---

[2] 700Credit, *700Credit Solutions: Credit, Compliance, Soft Pulls & Identity Verification,* https://www.700credit.com/wp-content/uploads/2025/04/700Credit-Overview-Booklet-25_microsite.pdf (last visited Dec. 15, 2025).

[3] Ionut Arghire, *700Credit Data Breach Impacts 5.8 Million Individuals*, Security Week (Dec. 15, 2025), https://www.securityweek.com/700credit-data-breach-impacts-5-8-million-individuals/ (last visited Dec. 15, 2025); 700Credit, *700Credit Suffers Data Breach*, https://www.700credit.com/notice/ (last visited Dec. 15, 2025).

[4] Ionut Arghire, *700Credit Data Breach Impacts 5.8 Million Individuals*, Security Week (Dec. 15, 2025), https://www.securityweek.com/700credit-data-breach-impacts-5-8-million-individuals/ (last visited Dec. 15, 2025).

gateways, and (4) regularly test, monitor, and update the security of its web-based application.

5.     700Credit owed duties to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their Sensitive Information against unauthorized access and disclosure. 700Credit breached those duties by, among other things, failing to implement and maintain reasonable security procedures and practices to protect the Sensitive Information entrusted to them from unauthorized access and disclosure.

6.     As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred and Plaintiff's and Class members' Sensitive Information was accessed by, and disclosed to, unauthorized third-party actors.

7.     The value of the type of Sensitive Information stolen in the Data Breach is well recognized in the modern data economy, including to cybercriminals on the dark web who use it for fraud and identity theft. As such, the foreseeable risk to individuals as a result of a criminal hacking event is well known and recognized by technology companies and others who gather and store data, including Defendant. Indeed, in most instances, stolen data ends up on the dark web, where cybercriminals purchase or exchange the data and use it for a host of fraudulent schemes and to perpetrate other cyber-attacks.

8.     The mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Sensitive Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure Plaintiff's and Class Member's Sensitive made that property vulnerable to being stolen. Despite that, 700Credit failed to implement reasonable data security and data-retention and disposal practices.

9.     Due to 700Credit's inadequate data security and the resulting Data Breach, Plaintiff and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

10.    Armed with the Sensitive Information accessed in the Data Breach, data thieves can commit a variety of crimes, including opening new financial accounts in Plaintiff's and Class Members' names, taking out loans in Plaintiff's and Class Members' names, using Plaintiff's and Class Members' names to obtain medical services, obtaining driver's licenses in Plaintiff's and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

11.    As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now closely monitor their financial accounts to guard against identity theft for the foreseeable future.

12.    The Data Breach has already had serious consequences and will continue to do so.  As a direct and proximate result of 700Credit's inadequate data security and the resulting Data Breach, Plaintiff and Class Members have suffered, and will continue to suffer, ascertainable losses, economic damages, and other actual injuries and harm, including: (i) from the untimely and inadequate notification of the Data Breach, (ii) the diminished value of their personal information; (iii) the resulting immediate and continuing risk of future ascertainable losses, economic damages and other actual injuries and harm, (iv) the opportunity cost and value of lost time they must spend to monitor their financial accounts and other accounts—for which they are entitled to compensation; (v) out-of-pocket expenses for securing identity theft protection and other similar necessary services; and (vi) emotional harm and distress from the exposure of their sensitive records and the prolonged and heightened risk of harm.

13.    Plaintiff seeks to remedy these harms on behalf of themselves and all similarly situated individuals whose received or were sent notice that their Sensitive Information was accessed during the Data Breach.

14.    Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs and for time spent responding to actual or potential fraud and mitigating their risk, and injunctive relief including

improvements to Defendant's data-security systems, future annual audits, and adequate credit-monitoring services funded by Defendant.

15. Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct and asserting claims on behalf of the Class as alleged below.

## JURISDICTION

16. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, there are 100 members or more in this proposed class, and at least one of those class members will be diverse from Defendant.

17. This Court has general personal jurisdiction over 700Credit because it is a Michigan company that maintains its principal place of business at 26555 Northwestern Hwy Suite #301, Southfield, MI 48033.

18. This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts a substantial part of their business and is headquartered within this District.

## PARTIES

19. **Plaintiff** Charley Karpinski is a citizen of Studio City, California.

20. Around May 15, 2025, Plaintiff Karpinski applied to lease a motor vehicle from a client of 700Credit—an automobile dealership called Nissan of Van Nuys ("the dealership").

21. When he leased the vehicle from the dealership, Plaintiff provided Defendant, either directly or indirectly, with his Sensitive Information including his name, address, social security number, and employment information.

22. Because Plaintiff provided his information between May and October 2025, his information was among the information included in the data breach.

23. Plaintiff Karpinski is very careful about sharing his own Sensitive Information and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Karpinski stores any and all documents containing Sensitive Information in a secure location and destroys any documents he receives in the mail that contain any Sensitive Information or that may contain any information that could otherwise be used to compromise his identity and financial accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts. Since learning of the Data Breach, Karpinski has spent time monitoring his accounts for fraud and fielding spam phone calls and emails.

24. Plaintiff Karpinski suffered actual injury from having his Sensitive

Information exposed as a result of the Data Breach, including: (a) time and effort monitoring his accounts for fraudulent charges and to mitigate the risk of harm from the Data Breach; (b) entrusting Sensitive Information to 700Credit that he would not have had the 700Credit disclosed that it lacked data security practices adequate to safeguard its patients; (c) damages to and diminution in the value of his Sensitive Information—a form of intangible property that he entrusted to 700Credit; (d) loss of his privacy; and (e) continuous imminent an impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

25. **Defendant 700Credit** is a Michigan company that maintains its principal place of business at 26555 Northwestern Hwy Suite #301, Southfield, MI 48033.

## FACTUAL ALLEGATIONS

**A.      700Credit Failed to Secure its Online Platform.**

26.      Defendant 700Credit is "the largest provider of credit reports, soft pull credit data, identity verification, fraud detection and compliance solutions for Automotive, RV, Powersports and Marine dealers in the US," and is utilized by over 21,000 dealerships.[5]

---

[5] 700Credit, https://www.700credit.com/ (last visited Dec. 14, 2025).

27.    To facilitate ease-of-access for its dealerships, 700Credit's web-based application 700Dealer.com integrates with a number of "DMS, Service Lane, F&I, CRM, sales & desking solutions."[6]

28.    700Credit accomplishes these integrations through the use of Application Programming Interfaces (APIs).

29.    At the most basic level, "APIs are mechanisms that enable two software components to communicate with each other using a set of definitions and protocols."[7]

30.    "In the context of APIs, the word Application refers to any software with a distinct function. Interface can be thought of as a contract of service between two applications. This contract defines how the two communicate with each other using requests and responses. Their API documentation contains information on how developers are to structure those requests and responses."[8]

31.    "APIs allow for the sharing of only the information necessary, keeping other internal system details hidden, which helps with system security."[9]

---

[6] 700Credit, *Partners*, https://www.700credit.com/about/700-credit-partners-2/ (last visited Dec. 15, 2025).
[7] AWSm *What is an API (Application Programming Interface)?*, https://aws.amazon.com/what-is/api/#:~:text=APIs%20are%20mechanisms%20that%20enable,use%20Simple%20Object%20Access%20Protocol.
[8] *Id.*
[9] IBM, *What is an API key?*, https://www.ibm.com/think/topics/api-key (last visited Dec. 15, 2025).

32.     APIs accomplish this through API keys, which are randomly generated, unique identifiers "used to authenticate software and systems attempting to access other software or systems via an application programming interface, or API."[10]

33.     "Each key that an API provider issues is associated with a specific API client, such as a software module. API keys enable an API server to identify which software and applications are sending a call to the API."[11]

34.     API keys, while part of API security, "should not be the only way that an organization authenticates and validates calls being made to an API."[12] IBM explains:

> [W]hile API keys are useful, they are not an especially secure method of authenticating calls. API keys can identify a specific application or project, but they cannot validate the individual user who is using the application making the calls. This makes API keys a poor choice for enforcing API access control. API keys only offer project identification and project authorization, not user identification or user authorization.
>
> Think of an API key like a password: it is one layer of security, but also a potential point of failure for a security breach. Like a password, anyone who has access to an API key can use it. There isn't a way to verify who is using the key; and keys rarely expire unless they are specifically regenerated.[13]

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

35.     In order to ensure maximum security, developers should deploy additional layers of verification such as a secure sockets layer (SSL) certification, otherwise known as hypertext transfer protocol secure (HTTPS) or should utilize authentication tokens.[14]

36.     Security experts recognize that APIs expand the risk landscape for supply chains, noting that APIs "provide[] threat actors with a new attack surface" and that the expanded attack surface, "has significant consequences for managing software supply chain risk."[15]

37.     A September 2023 report illustrated the degree to which this risk was born out. According to the report, 78% of organizations experienced a security incident between September 2022 and September 2023.[16]

38.     That risk bore out for 700Credit in July 2025 when hackers breached the systems of one of 700Credit's hundreds of integration partners.[17] Once within the partner's systems, hackers "gained access to communications logs, which

---

[14] *Id.*

[15] John P. Mello Jr., *Are APIs the weak link in your supply chain security?*, ReversingLabs (Oct. 10, 2023), https://www.reversinglabs.com/blog/5-ways-apis-can-be-the-weak-link-in-supply-chain-security (last visited Dec. 15, 2025).

[16] *Id.*

[17] Ionut Arghire, *700Credit Data Breach Impacts 5.8 Million Individuals*, SecurityWeek (Dec. 15, 2025), https://www.securityweek.com/700credit-data-breach-impacts-5-8-million-individuals/ (last visited Dec. 15, 2025).

exposed an API used to pull consumer information" for one of 700Credit's applications, 700Dealer.com.[18]

39.    The incident occurred due to a vulnerability in 700Credit's API protocol. As Managing Director of 700Credit Ken Hill explained, 700Credit was not "validating the consumer reference IDs to the original requester."[19] In order words, 700Credit was failing to adequately authenticate and authorize requests.

40.    As a result, on October 25, 2025, cybercriminals launched a successful attack against 700Credit's 700Dealer.com application and gained 20% of consumer data accumulated between May and October 2025.[20]

41.    This consumer data included the names, addresses, dates of birth, and Social Security numbers of over 5.8 million individuals.[21]

---

[18] *Id.*; Jasmine Daniel, *700Credit's Ken Hill on recent data breach and what dealers need to know*, CBT News (Dec. 4, 2025), https://www.cbtnews.com/700credits-ken-hill-on-recent-data-breach-and-what-dealers-need-to-know/ (last visited Dec. 15, 2025).

[19] Jasmine Daniel, *700Credit's Ken Hill on recent data breach and what dealers need to know*, CBT News (Dec. 4, 2025), https://www.cbtnews.com/700credits-ken-hill-on-recent-data-breach-and-what-dealers-need-to-know/ (last visited Dec. 15, 2025).

[20] *Id.*

[21] Ionut Arghire, *700Credit Data Breach Impacts 5.8 Million Individuals*, SecurityWeek (Dec. 15, 2025), https://www.securityweek.com/700credit-data-breach-impacts-5-8-million-individuals/ (last visited Dec. 15, 2025).

**B.     700Credit Failed to Implement Reasonable Safeguards.**

42.     Per the Managing Director of 700Credit Ken Hill, 700Credit was not "validating the consumer reference IDs to the original requester."[22] This failure to validate consumer reference IDs violates well-established API best practices.

43.     F5, an industry leading application security servicer, identified a number of best practices for API security. Among the most critical are deploying strong authentication and authorization protocols.[23] As explained by F5:

> Authentication and authorization are fundamental elements of API security. Authentication involves verifying the identity of users or systems trying to access an API by ensuring that the entity making the request is who it claims to be. Common authentication methods include username/password, API keys, tokens, and biometrics. Authorization determines what actions an authenticated user or system is allowed to perform within the API. This involves defining access control rules, roles, and permissions. Role-based access control (RBAC) and attribute-based access control (ABAC) are commonly used authorization models. By enforcing proper authorization checks, organizations can ensure that authenticated clients have the necessary permissions to access specific resources or perform certain actions. Granular access controls can limit access to sensitive API endpoints or data, as well as relevant objects and functions.

---

[22] Jasmine Daniel, *700Credit's Ken Hill on recent data breach and what dealers need to know*, CBT News (Dec. 4, 2025), https://www.cbtnews.com/700credits-ken-hill-on-recent-data-breach-and-what-dealers-need-to-know/ (last visited Dec. 15, 2025).

[23] F5, *What Is API Security? Main Types and Use Cases*, https://www.f5.com/glossary/api-security (last visited Dec. 15, 2025).

Open Authorization (OAuth) protocols are a key component of strong authentication and authorization practices. OAuth eliminates the need for users to share their usernames and passwords directly with third-party applications. Instead, OAuth grants access tokens that represent limited and scoped permissions, reducing the risk of credential theft and misuse. It allows API providers to define fine-grained access controls through scopes and permissions, ensuring that third-party applications can only access the specific resources and actions authorized by the user, reducing the risk of unauthorized access.

Improper implementation of authentication and authorization mechanisms can lead to multiple threats to API security.[24]

44. API best practices also include the use of "rate limiting and throttling."[25] Rate limiting and throttling are "mechanisms [that] control the rate at which clients can make requests to the API, preventing abuse or overuse of the API, preventing excessive consumption of resources, and protecting the API from potential denial-of-service (DoS) attacks."[26]

45. "Rate limiting allows API providers to manage and regulate traffic flow, providing fair access to resources while helping to protect against potential security threats. It contributes to system stability, improves security posture and helps optimize resource utilization. If rate limiting is not implemented, compromised API keys can be exploited indiscriminately by attackers. Without rate limits,

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

attackers can use compromised API keys to execute automated attacks at scale."[27] Effective rate-limiting policies, "can significantly delay attackers' attempts to compromise sensitive data or exploit vulnerabilities, giving organizations  more time to identify and address security incidents."[28]

46.     API best practices also include the use of API gateways. "API gateways serve as a protective layer in an API ecosystem by providing a centralized point of control, security, and management for API traffic. They act as a security and management layer that shields the underlying API infrastructure from many common threats and operational challenges, including enforcing authentication and authorization policies, and traffic filtering, rate limiting, and throttling to prevent API abuse."[29]

47.     Finally, organizations utilizing APIs should engage in regular testing, monitoring, and updating. As explained by F5, "Continuous monitoring focus areas should include scheduled vulnerability scanning and penetration testing to help identify weaknesses, vulnerabilities, and misconfigurations in the API, while static code analysis and dynamic application security testing (DAST), assess the API

---

[27] Hugo Guerrero, *API Security: The importance of rate limiting policies in safeguarding your APIs* (June 28, 2025), https://www.redhat.com/en/blog/api-security-importance-rate-limiting-policies-safeguarding-your-apis (last visited Dec. 15, 2025).

[28] *Id.*

[29] F5, *What Is API Security? Main Types and Use Cases*, https://www.f5.com/glossary/api-security (last visited Dec. 15, 2025).

codebase and runtime behavior for security weaknesses. Regularly update software components used in the API stack, including operating systems, web servers, libraries, and frameworks, to address known vulnerabilities, as unpatched software can be a prime target for attackers."[30]

48.     In all, Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data-security system to reduce the risk of data breaches and cyberattacks
- Failing to meet the standards established by its data-security and privacy policies
- Failing to adequately protect PII entrusted to it
- Failing to properly monitor its own data security systems for existing intrusions
- Failing to adhere to industry standards for cybersecurity.

49.     Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Sensitive Information by allowing cyberthieves to access Defendant's computer systems which contained unsecured and unencrypted Sensitive Information.

## C.     700Credit Knew It Needed to Protect Plaintiff's and the Class's Sensitive Data

50.     700Credit has received ample warning of the need to protect sensitive data.

---

[30] *Id.*

51.     For example, the FTC has issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security into all business decision-making.[31] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on  networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[32]

52.     The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

53.     As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter*

---

[31] Federal Trade Comm'n, *Start with Security A Guide For Business, Lessons Learned from FTC Cases* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[32] *Id.*; Federal Trade Comm'n, *Protecting Personal Information, A Guide For Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

*of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . .").

54.    The FTC has also issued orders specifically relating to companies' deficient API security practices. In January 2025, the FTC acted against web-hosting company GoDaddy for, among other things, failing to adequately follow secure API

protocols.[33] Specifically, the FTC alleged that GoDaddy failed to secured connections to APIs that provide access to consumer data. Specifically, the FTC alleged that GoDaddy (1) failed to use MFA for its internet-facing APIs, (2) used "basic authentication" rather than "HTTPS— the standard the standard encryption for web traffic," (3) failed to restrict access to trusted applications using an application firewall, (4) failed to rate limit connections to the API, and (5) failed to adequately monitor for anomalies.[34]

55.     In FTC issued its order relating to GoDaddy on May 21, 2025, requiring GoDaddy to "protect any API developed by Respondents that provides access to any Hosting Service configuration or administration or Covered Information by, at a minimum:

> a. Using technical controls to require connections to the API to use HTTPS or an equivalently secure transfer protocol for all requests;
>
> b. Requiring that all requests to any such API that provides access to Covered Information, including any Hosting Service administration tool that can access Covered Information, be authenticated using a method that protects authenticity at the session level and includes appropriate

---

[33] Federal Trade Commission, *FTC Takes Action Against GoDaddy for Alleged Lax Security for Its Website Hosting Services* (Jan. 15, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-takes-action-against-godaddy-alleged-lax-data-security-its-website-hosting-services (last visited Dec. 15, 2025); *In the Matter of GoDaddy Inc.,* No 202-3133 (Jan. 15, 2025) (Complaint).
[34] *In the Matter of GoDaddy Inc.,* No 202-3133 (May 21, 2025).

protections against session hijacking and the insertion of false information into sessions;

c. Using appropriate rate-limiting for connections to the API; and

d. Monitoring inbound and outbound API communications traffic, to detect attacks and indicators of potential attacks."[35]

56.     An increase in the quantity of cyberattacks on the auto industry should also have put 700Credit on notice of the risk of cyberattacks. In June 2024, CDK Global—an auto-dealer software provider—resulted in the potential exposure of car buyers' names, social security numbers, employment histories, incomes, and contact details.[36] In April and May, 2024, cybercriminals breached the IT systems of Advance Auto Parts—a leading auto parts retailer—and accessed the names, social security numbers, and driver's licenses of 2.3 million individuals.[37]

57.     Indeed, in its notice 700Credit acknowledges the repeat nature of cyberattacks attacks against the automotive industry, informing consumers that

---

[35] *Id.*

[36] Jennifer Gregory, *Hackers are increasingly targeting auto dealers*, IBM, https://www.ibm.com/think/news/hackers-increasingly-targeting-auto-dealers (last visited Dec. 15, 2025).

[37] Ashish Khaitan, *After Advance Auto Parts Data Breach, Claims of Modern Automotive Network Cyberattack Surface*, The Cyber Express, (July 18, 2024) https://thecyberexpress.com/allege-modern-automotive-network-cyberattack/ (last visited Dec. 15, 2025).

"700Credit regrets to inform you that our industry was attacked again by a bad actor."

58.     Notwithstanding this awareness, 700Credit failed to adequately secure its systems, leading to the exposure of the Sensitive Information of over 5.8 million individuals.

**D.     700Credit's Data Security Failures Have Harmed Plaintiff and the Class**

59.     Personal Information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" to corporations in America. Illustratively, Alphabet Inc., the parent company of Google, reported in its 2020 Annual Report a total annual revenue of $182.5 billion and net income of $40.2 billion.[38] $160.7 billion of this revenue derived from its Google business, which is driven almost exclusively by leveraging the Personal Information it collects about users of its various free products and services.

60.     Criminal law also recognizes the value of Personal Information and the serious nature of the theft of Personal Information by imposing prison sentences. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Personal Information. Once a cybercriminal

---

[38] *Alphabet Inc., Annual Report (Form 10-K)*, SEC, at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/ data/0001652044/000165204421000010/goog-20201231.htm.

has unlawfully acquired Personal Information, the criminal can demand a ransom or blackmail payment for its destruction, use the Personal Information to commit fraud or identity theft, or sell the Personal Information to other cybercriminals on the black market.

61.     The U.S. Government Accountability Office ("GAO") released a report as far back as 2007 regarding data breaches, finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[39]   This has not changed over the nearly two decades since this study.

62.     The GAO Report explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name."

63.     Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[40]

---

[39] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].
[40] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things: "[n]ame, social security number, date of

According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; or use the victim's information in the event of arrest or court action.[41]

64. With access to an individual's Sensitive Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and Social Security number to obtain government benefits; or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during

---

birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[41] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Private Information and How Can You Protect Yourself*, Experian (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

an arrest, resulting in an arrest warrant being issued in the victim's name.[42]

65.     Identity theft presents many challenges.  In a survey, the Identity Theft Resource Center ("ITRC") found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[43]

66.     The risk of identity theft after a data breach is lasting. The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web—as is the case in this Data Breach—fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot rule out the significant risk of future harm."[44]

---

[42] *Id.*

[43] *ITRC Annual Data Breach Report 2023*, ITRC (2023), https://www.idtheftcenter.org/publication/2023-data-breach-report/.

[44] Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (Jun. 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).

## CLASS ALLEGATIONS

67.    Plaintiff brings this action on behalf of himself and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 and seeks certification of the following Nationwide Class:

> All individuals that received or were otherwise sent notice that their data was potentially compromised due to 700Credit's Data Breach.

68.    Excluded from the class is 700Credit and its subsidiaries and affiliates; all employees of 700Credit; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

69.    Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

70.    **Numerosity**.  Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are over one million members of the Class. The number of reportedly impacted individuals already exceeds 5.6 million. The precise number of class members, however, is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified

of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

71. **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

a. Whether 700Credit knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

b. Whether 700Credit controlled and took responsibility for protecting Plaintiff's and the Class's data when solicited that data, collected it, and stored it on its application;

c. Whether 700Credit security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d. Whether 700Credit owed Plaintiff and the Class a duty to implement reasonable security measures;

e. Whether 700Credit's failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

f. Whether 700Credit's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and the Class's data;

g. Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

26

h.      Whether Plaintiff and the Class were injured and suffered damages or other losses because of 700Credit's failure to reasonably protect its data systems; and

i.      Whether Plaintiff and the Class are entitled to relief.

72.    **Typicality**.  Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons whose data was provided to 700Credit, whose data resided on 700Credit's applications, and whose Sensitive Information was exposed in 700Credit Breach. Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

73.    **Adequacy**.  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against 700Credit to obtain relief for himself and for the Class.  Plaintiff has no conflicts of interest with the Class.  Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

74.    **Superiority**.  Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would

strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

75. **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), 700Credit, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence

76. Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

77. 700Credit owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and the Class and managed and stored. This duty arises from multiple sources.

78.     700Credit owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target 700Credit's data systems containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed. 700Credit alone controlled its technology, infrastructure, and cybersecurity. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. Furthermore, 700Credit knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of 700Credit's unsecured, unreasonable data security measures.

79.     Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required 700Credit to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of 700Credit's duty to Plaintiff and the Class.   Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like 700Credit of failing to use reasonable measures to protect sensitive data.  700Credit, therefore, was required and obligated to take reasonable

measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of 700Credit's duty to adequately protect sensitive information. By failing to implement reasonable data security measures, 700Credit acted in violation of § 5 of the FTCA.

80.    700Credit is obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring 700Credit to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

81.    Finally, 700Credit assumed the duty to protect patients' sensitive data by soliciting, collecting, and storing individuals' data and, additionally, by representing to its customers that it would keep their customers' data safe.

82.    700Credit breached its duty to Plaintiff and the Class by implementing unreasonable data security measures that it knew or should have known could cause a Data Breach. 700Credit knew or should have known that hackers might target sensitive data that 700Credit solicited and collected on its users and, therefore, needed to use reasonable data security measures to protect against a Data Breach.

83.    700Credit was fully capable of preventing the Data Breach. 700Credit knew or should have known of data security measures required or recommended by

the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. 700Credit thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

84.     As a direct and proximate result of 700Credit's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

## COUNT II
## Negligence *Per Se*

85.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

86.     700Credit's unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, requires businesses to institute reasonable data security measures and breach notification procedures, which 700Credit failed to do.

87.     Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like 700Credit of failing to use reasonable measures to protect users' sensitive data.  The FTC publications and orders described above also form the basis of 700Credit's duty.

88. 700Credit violated Section 5 of the FTC Act by failing to use reasonable measures to protect individuals' personally identifying information and sensitive data and by not complying with applicable industry standards. 700Credit's conduct was particularly unreasonable given the sensitive nature and amount of data it stored on individuals and the foreseeable consequences of a Data Breach should 700Credit fail to secure its systems.

89. 700Credit violation of Section 5 of the FTC Act constitutes negligence *per se*.

90. Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) was intended to protect. Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

91. As a direct and proximate result of 700Credit's negligence per se, Plaintiff and the Class have suffered and continue to suffer injury.

## COUNT III
## Declaratory and Injunctive Relief

92. Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

32

93.     Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

94.     An actual controversy has arisen in the wake of the Data Breach at issue regarding 700Credit's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class.  Plaintiff alleges 700Credit's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable.  Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

95.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

   a.     700Credit owed, and continues to owe a legal duty to secure the sensitive information with which it is entrusted, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

      b.     700Credit breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and

      c.     700Credit's breach of its legal duty continues to cause harm to Plaintiff and the Class.

96.    The Court should also issue corresponding injunctive relief requiring 700Credit to employ adequate security protocols consistent with industry standards to protect its individuals' (*i.e.* Plaintiff's and the Class's) data.

97.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of 700Credit's data systems. If another breach of 700Credit's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

98.    The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to 700Credit if an injunction is issued.

99.     Issuance of the requested injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

100.    Wherefore, Plaintiff, on behalf of himself and the Class, requests that this Court award relief as follows:

a.      An order certifying the class and designating Plaintiff as the Class Representative and their counsel as Class Counsel;

b.      An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c.      A declaratory judgment in favor of Plaintiff and the Class;

d.      Injunctive relief to Plaintiff and the Class;

e.      An award of attorneys' fees and costs as allowed by law; and

f.      An award such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

101.    Plaintiff hereby demands a jury trial for all the claims so triable.

Respectfully submitted,

Dated: December 17, 2025          /s/ Gregory A. Mitchell
                                 E. Powell Miller (P39487)
                                 Gregory A. Mitchell (P68723)
                                 **THE MILLER LAW FIRM, P.C.**

950 West University Drive
Rochester, MI  48307
Telephone: (248) 841-2200
epm@millerlawpc.com
gam@millerlawpc.com

Brian C. Gudmundson
(*admission forthcoming*)
Madison M. DeMaris
(*admission forthcoming)*
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
madison.demaris@zimmreed.com

*Counsel for Plaintiff*